**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NORTHWEST 1 TRUCKING INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-397 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ALEJANDRO HARO, individually, | ) | |
| ALEJANDRO HARO d/b/a | ) | |
| JCS EQUIPMENT, | ) | |
| JAVIER COVARRUBIAS, individually, | ) | |
| and JAVIER COVARRUBIAS d/b/a | ) | |
| JCS EQUIPMENT, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves an alleged bait-and-switch in the sale of a bulldozer. Plaintiff Northwest 1 Trucking bought a bulldozer from Defendant Alejandro Haro, who sells heavy machinery in Texas. Haro allegedly promised that the dozer was a strong piece of machinery and was perfect for Northwest 1 Trucking's excavation project. Northwest 1 Trucking agreed, and more than $150,000 later, the bulldozer arrived in Illinois.

The bulldozer turned out to be a giant lemon. Within two hours, smoke billowed out, the engine seized up, and the machine broke down. The dozer doesn't even run, let alone perform the heavy work anticipated by the buyer. Northwest 1 Trucking is now stuck with almost 50 tons of non-working steel, and it wants its money back. So Northwest 1 Trucking sued.

Defendants Alejandro Haro and Javier Covarrubias (who do business together under the assumed name JCS Equipment – *see* Dckt. No. 22-3) moved to dismiss on three grounds. First, they argue that this Court lacks personal jurisdiction over them, even though JCS Equipment

sold the dozer to a buyer in Illinois. Second, they argue that this case belongs in Texas state court because their invoice included a forum selection clause. Third, they move to dismiss for improper venue.

For the reasons stated below, Defendants' Motion to Dismiss is granted in part and denied in part. Defendant Haro's motion to dismiss for lack of personal jurisdiction is denied. Defendant Covarrubias's motion to dismiss for lack of personal jurisdiction is granted. The rest of the motion is denied.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020). The Court can consider facts outside the pleadings on a motion to dismiss for lack of personal jurisdiction or for improper venue. *See Curry v. Revolution Labs., LLC*, 949 F.3d 385, 393 (7th Cir. 2020); *see also Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019).

Plaintiff Northwest 1 Trucking is a metal recycling business based in Chicago. *See* Am. Cplt. ¶ 5 (Dckt. No. 18). In August 2018, Northwest 1 Trucking was in the market for a bulldozer to help excavate 30 acres of property. *See* Am. Decl. of Tony Maldonado, at ¶¶ 9–10, 14 (Dckt. No. 46). While shopping for a dozer, Northwest 1 Trucking visited the website of Defendant JCS Equipment. *See* Am. Cplt. ¶ 15; Am. Decl. of Tony Maldonado, at ¶ 10. JCS Equipment – an unincorporated business operated by Defendants Alejandro Haro and Javier Covarrubias – sells heavy-duty construction equipment from its base in Houston, Texas. *See* Am. Cplt. at ¶¶ 6, 8–11. The website included pictures of various bulldozers, but didn't mention

2

anything about excluding warranties or selecting Texas as the exclusive forum for disputes. *See* Am. Decl. of Tony Maldonado, at ¶ 10.

Tony Maldonado, the principal of Northwest 1 Trucking, reached out to JCS by phone and spoke with Alejandro Haro. *See* Am. Cplt. ¶ 16. Maldonado and Haro spoke on the phone a number of times about the bulldozer. *Id.* at ¶¶ 16, 18. Haro "continuously pursued the potential sale." *Id.* at ¶ 17. He called Maldonado at least six times. *Id.* at ¶ 16.

During the calls, Maldonado made clear that he needed the dozer to level and excavate 30 acres of land in Chicago. *Id.* at ¶ 18. Haro allegedly promised that the machinery had a "new engine," was in "perfect shape," and was "totally capable" of "leveling and excavating . . . 30 acres in Chicago for the expansion of Plaintiff's business." *Id.* at ¶¶ 19–20. He "guaranteed" that the bulldozer would "run forever." *Id.* at ¶¶ 19, 22.

"Never" would have been closer to the truth. The bulldozer "began to smoke and then shut down" after only two hours. *Id.* at ¶ 30. Northwest 1 Trucking later discovered that the machine suffered from fuel dilution, which is the contamination of oil by fuel. *Id.* at ¶¶ 29–33. Diluted oil – meaning oil that is watered down with diesel fuel – is less effective at lubricating the engine. It can lead to friction in the crankcase, and it can put the entire engine at risk. *Id.* Here, the bulldozer received an oil change after delivery (so, the oil was fresh), but still experienced fuel dilution, which suggests that there was something wrong with the engine from the get-go. *Id.*

Northwest 1 Trucking is now stuck with a hefty piece of non-working machinery. Fixing the dozer would cost more than $75,000 in parts alone. *Id.* at ¶ 34. When Northwest 1 Trucking told Haro about the problems with the engine, Haro allegedly responded: "sue me." *Id.* at ¶ 35. So Northwest 1 Trucking did just that.

Northwest 1 Trucking claims that Defendants pulled the wool over its eyes by delivering a different piece of machinery than the one that they had agreed upon. The bulldozer that arrived "did not resemble the machine illustrated in the photos on the JCS Equipment website." *Id.* at ¶ 26. It was more "rusted" and "used" than the dozer depicted on-line. *Id.* at ¶ 27. Northwest 1 Trucking paid more than $150,000 for a smoking hunk of metal that won't even run. *Id.* at ¶¶ 23–24.

Defendants, for their part, contend that Northwest 1 Trucking agreed to buy the bulldozer "as is," imperfections and all. *See* Decl. of Alejandro Haro at ¶ 15 (Dckt. No. 22-2). They insist that they didn't hide the ball. In fact, they made the dozer available for inspection before the sale, and Northwest 1 Trucking's agent inspected the machinery in person – *twice*. *Id.* at ¶¶ 15–16.

More importantly for present purposes, Defendants moved to dismiss based on improper venue. They argue that this lawsuit belongs in Texas, not Illinois, because the parties agreed to a forum selection clause. They point to an invoice that Haro sent to Northwest 1 Trucking, which contained the following provision: "TO BE SOLD 'AS IS' ANY SUITS OR DISCLAIMERS ARE TO BE REVIEWED IN A COURT OF HOUSTON, HARRIS COUNTY, TEXAS." *See* JCS Invoice (Dckt. No. 22-4) (all caps in original). That language appeared at the bottom of the one-page invoice, not far from the purchase price.

Based on the complaint and the briefs, the chronology was a little up in the air. It was unclear whether Haro sent the invoice before, or after, Maldonado wired the money. Haro insisted that he sent the invoice before Northwest 1 Trucking wired the funds, but dates and details were lacking. *See* Decl. of Alejandro Haro, at ¶ 22 (Dckt. No. 22-2) ("*After* I sent the invoice to the Plaintiff, the Plaintiff wired $150,000.00 into the JCS Equipment bank account

4

listed on the invoice.") (emphasis added). But Maldonado represented that it was the other way around. Money first; invoice second. *See* Decl. of Tony Maldonado, at ¶ 22 (Dckt No. 23-2) ("*[A]fter* the complete payment of the agreed upon purchase price and the delivery expenses Defendant Haro sent an invoice with different terms including exclusive Texas jurisdiction and no warranties.") (emphasis added). So, this Court posed a series of questions to the parties, and ordered supplemental submissions to nail things down. *See* Dckt. No. 39.

Haro's supplemental submission offered fresh details. He represented that he sent the invoice by "email on August 31, 2018 at 9:41 a.m. and 9:45 a.m. Central Daylight Time." *See* Defs.' Answer to Judge's Nov. 20, 2019 Order, at ¶ 1 (Dckt. No. 43). In an accompanying declaration, Haro represented that he emailed the invoice three times – once at 9:41 a.m., and two more times at 9:45 a.m. *See* Decl. of Alejandro Haro, at ¶ 9 (Dckt. No. 43-1). He stated that he sent them to a specific email address: "The email address that these emails with the invoices [sic][1] was sent to was tonymadonado305@yahoo.com who is a principal in Northwest 1 Trucking." *Id.* at ¶ 10.

And sure enough, Haro attached copies of the three emails, all addressed to tonymadonado305@yahoo.com. *See* Dckt. No. 43-1, at 5, 6, 7. Haro's declaration represented that the three emails arrived safe and sound. "Our computer did not receive any rejection stating that these emails were rejected by the Yahoo server." *See* Decl. of Alejandro Haro, at ¶ 11.

This Court spotted a potential problem. Haro emailed the invoice to tonymadonado305@yahoo.com, but the person's name is spelled Tony Ma*l*donado – with an "L" – not Tony Madonado. It's not unheard of for people to tweak the spelling of their names in their email addresses, but omitting an "L" in the middle of Maldonado's name would be

---

[1] There was only one invoice.

surprising. If the email address was wrong, it might explain why Tony Maldonado can't seem to find any such email. *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's Nov. 20, 2019 Order, at 2 (Dckt. No. 45) ("Apparently an email was sent sometime on August 31, 2018 by Defendant Haro, however as of this date Plaintiff is having difficulty locating such a communication . . . .").

So, once again, this Court *sua sponte* ordered the parties to file supplemental submissions, to set the record straight. *See* Dckt. No. 57. This Court directed Maldonado to confirm all email addresses that he used in 2018. *Id.* The Court also directed the parties to file examples of any emails exchanged between the parties. *Id.* Basically, the Court had doubts about whether Maldonado ever received the emails – with the invoice containing the forum selection clause – because his name apparently was misspelled.

Tony Maldonado confirmed this Court's suspicions. The only email address that he used in 2018 was "tonymaldonado305@yahoo.com," with an "*L*." He never used "tonymadonado305@yahoo.com." *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's April 15, 2020 Order, at ¶¶ 1–2 (Dckt. No. 59). So the emails that Haro attached to his original filing were sent to the wrong email address. *See* Email dated 8/31/18, at 9:41 a.m. (Dckt. No. 43-1, at 5 of 7); Email dated 8/31/18, at 9:45 a.m. (Dckt. No. 43-1, at 6 of 7); Email dated 8/31/18, at 9:45 a.m. (Dckt. No. 43-1, at 7 of 7).

Haro didn't exactly change his tune, but he sang it differently in his second supplemental submission. For the first time – months after the first supplemental submission – Haro now claims that he "checked my computer and found an email addressed to tonymaldonado305@yahoo.com." *See* Am. Decl. of Alejandro Haro, at ¶ 5 (Dckt. No. 58). That's Maldonado with an "L." He sent that (recently discovered) email to Maldonado at 9:42 a.m. on August 31, 2018. *Id.*

6

Haro filed that email as an exhibit, and sure enough, he sent it to the right email address. *See* Email dated 8/31/2018 (Dckt. No. 58-1). Haro now remembers that his first email (at 9:41 a.m.) bounced back after all, even though he originally told this Court the opposite. *Compare* Am. Decl. of Alejandro Haro, at ¶ 9 (Dckt. No. 58) ("When I sent the first email to Mr. Maldonado at 9:41 a.m. I now remember it being bounced back.") *with* Am. Decl. of Alejandro Haro, at ¶ 11 (Dckt. No. 43-1) ("Our computer did not receive any rejection stating that these emails were rejected by the Yahoo server.").

That's a long way of saying that Haro emailed Maldonado a copy of the invoice at 9:42 a.m. on August 31, 2018. Maldonado can't find a copy of that email, but he doesn't deny receiving it, either. *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's April 15, 2020 Order, at ¶¶ 3, 7 (Dckt. No. 59). He admits that he discovered a copy of the invoice in his office on September 4, 2018 (after Labor Day weekend). *Id.* at ¶¶ 4–5; *see also* Pl.'s Resp. to Hon. Judge Steven C. Seeger's November 20, 2019 Order, at 1 (Dckt. No. 45) ("I became aware on September 4 2018 that sometime on August 31, 2018 Defendant Haro sent an invoice apparently via email with different terms including exclusive Texas jurisdiction and no warranties.").

In his email on August 31, Haro encouraged Maldonado to read the invoice and alert him if anything was amiss. "Attached is the invoice for the Caterpillar D9N BullDozer you are purchasing. Please review the invoice and if you see an error please let us know and we will correct it." *See* Email dated 8/31/2018 (Dckt. No. 58-1).

The parties also clarified the timing of the payment in their supplemental submissions. At 10:30 a.m., roughly 45 minutes after Haro emailed the invoice, Northwest 1 Trucking wired the funds to JCS Equipment's bank. *See* Defs.' Answer to Judge's November 20, 2019 Order, at ¶ 4 (Dckt. No. 43); Bank of America Statement, at 5 (Dckt. No. 43-2) ("TIME: 1130 ET"); *see*

*also* Pl.'s Bank Transaction Screenshot (Dckt. No. 45-1) (same). Maldonado claims that he didn't rely on the invoice for the wiring instructions because Haro shared them over the phone before August 31. *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's April 15, 2020 Order, at ¶ 6 (Dckt. No. 59).

Putting all the pieces together, the story unfolded in the following order. Haro emailed the invoice to Maldonado on August 31, and Maldonado wired the money to JCS Equipment less than an hour later. Maldonado did receive the invoice, but he claims that he didn't see it until four days later on September 4.

Northwest 1 Trucking also paid $10,500 in delivery fees after wiring the $150,000 purchase price on August 31. The company paid the fees in two installments: it wired $5,000 on September 7, 2018, and $5,500 on September 11, 2018. *See* Am. Decl. of Tony Maldonado, at ¶ 25 (Dckt. No. 46); *see also* Bank of America Funds Transfer Request Authorization (Dckt. No. 46-2). But JCS Equipment did not keep the delivery fees. A "different entity" – not JCS Equipment – handled the delivery of the 50-ton crawler on its 1,000-mile journey. *See* Pl.'s Resp. to Judge Seeger's Order, at 2 (Dckt. No. 45); *see also* Dckt. No. 22-5, at 3 of 3 (check from JCS Equipment showing payment of all of the delivery fees to a third party).

Northwest 1 Trucking never argues that it objected to the invoice. Haro claims that "[n]either I nor JCS Equipment received any communication objecting to the terms of this invoice." *See* Decl. of Alejandro Haro, at ¶ 24 (Dckt. No. 22-2). Even so, Northwest 1 Trucking did not affirmatively accept the terms of the invoice, either.

After Northwest 1 Trucking paid the delivery fees, the bulldozer traveled across the country, arrived in Chicago, started to smoke, and died.

### Analysis

Defendants move to dismiss on three grounds. First, they argue that this Court lacks personal jurisdiction over them because they have no ties to Illinois. Second, they contend that the parties agreed to a forum selection clause that requires all litigation to take place in state court in Texas. Third, they move to dismiss for improper venue.

Right off the bat, Defendants' motion requires a little housekeeping. Defendants ask this Court to transfer this case to Texas state court under 28 U.S.C. § 1404 in light of a forum selection clause. But that statute authorizes transfers from one federal district to another federal district. *See* 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . ."). Section 1404(a) "has no application" when a party seeks to move from federal court to state court. *See Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013). Instead, "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens.*" *Id.*; *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). So this Court will consider the motion about the forum selection clause to be a motion to dismiss for *forum non conveniens*, not a motion to transfer under section 1404.

The motion to dismiss also invoked Rule 12(b)(7), which is a motion to dismiss for failure to join a necessary party. *See* Mot. to Dismiss, at 1 (Dckt. No. 22-1). Defendants do not elaborate – they don't even say who allegedly is missing – and thus the argument is waived. *See United States v. Watson*, 189 F.3d 496, 500 (7th Cir. 1999); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 801 (N.D. Ill. 2019).

Finally, in addition to Alejandro Haro and Javier Covarrubias (individually), Northwest 1 Trucking sued "Alejandro Haro d/b/a JCS Equipment" and "Javier Covarrubias d/b/a JCS Equipment." *See* Am. Cplt. (Dckt. No. 18). JCS Equipment itself is not a defendant,[2] and it apparently is not a suable entity, either. It is simply a name used by Haro and Covarrubias when doing business. *See Pl.'s Statement of Residency and Domicile and Amended Jurisdictional Statement*, at ¶¶ 2, 6 (Dckt. No. 38) ("Plaintiff is suing natural persons Alejandro Haro and Javier Covarrubias who are doing business under the assumed name of JCS Equipment. . . . JCS Equipment is a sole proprietorship with a prior registration in Harris County Texas in the Assumed Name Records showing Javier Covarrubias as the owner from June 18, 2008 through June 18, 2018."); *see also Wade v. TBF Financial, LLC*, 2019 WL 1051599, at *2 n.2 (Tex. App. 2019) ("It is well established that a 'd/b/a' (doing business as) is 'no more than an assumed name or trade name' and 'has no legal existence.'") (quoting *Kahn v. Imperial Airport, LP*, 308 S.W.3d 432, 438 (Tex. App. 2010)); *General Ins. Co. of America v. Clark Mall, Corp.*, 631 F. Supp. 2d 968, 973 (N.D. Ill. 2009) ("Generally, the designation 'd/b/a' or 'doing business as' is merely descriptive of the person or corporation doing business under some other name and does not create a distinct entity."); *Shales v. Schroeder Asphalt Servs., Inc.*, 2013 WL 2242303, at *4 n.3 (N.D. Ill. 2013); *York Grp., Inc. v. Wuxi Taihu Tractor Co.*, 632 F.3d 399, 403–04 (7th Cir. 2011) ("A proprietorship is just a name that a real person uses when doing business; it is not a juridical entity."). Haro and Covarrubias are the real parties in interest, *see* Fed. R. Civ. P. 17, so the jurisdictional analysis focuses on their contacts with the forum state.

---

[2] This Court ordered Plaintiff to clarify whether he was attempting to sue JCS Equipment as a defendant. *See* Order dated Nov. 7, 2019 (Dckt. No. 36). Plaintiff responded that it is suing Haro and Covarrubias d/b/a JCS Equipment, but it did not claim that JCS Equipment is a Defendant, too. *See* Pl.'s Statement of Residency and Domicile and Amended Jurisdictional Statement (Dckt. No. 38). Suing JCS Equipment in and of itself apparently would be futile because it is not a legal entity.

## I.     Personal Jurisdiction

Defendants Haro and Covarrubias first move to dismiss for lack of personal jurisdiction. The motion basically recounts all of the ways in which they lack roots in Illinois. And to the extent that they did business here, Defendants argue that Northwest 1 Trucking dragged them here. The gist of the argument is that the sale was the buyer's idea.

The party asserting jurisdiction has the burden of proof. *See Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). The Court may consider affidavits and other competent evidence submitted by the parties. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When the Court rules on the motion without a hearing (as it does here), the plaintiff need only establish a *prima facie* case of personal jurisdiction. *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). The Court will "read the complaint liberally, in its entirety, and with every inference drawn in favor of" the plaintiff. *Central States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (quoting *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir. 1993)). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction," however, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783. Any dispute concerning relevant facts is resolved in the plaintiff's favor. *Id.* at 782–83.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Federal courts look to state law because their "authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the

state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). So Rule 4 directs courts to state long-arm statutes.

A federal court sitting in diversity can exercise jurisdiction over a defendant "only if authorized both by Illinois law and by the United States Constitution." *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011); *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). The Illinois long-arm statute authorizes courts to exercise personal jurisdiction over defendants who engage in a number of specifically enumerated acts, including the "transaction of any business within this State" and the "making or performance of any contract or promise substantially connected with this State." 735 ILCS 5/2-209(a)(1), (7).

The Illinois long-arm statute also contains a catch-all provision that authorizes courts to "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). There is "no operative difference" between the federal and state Constitutions on the limits of personal jurisdiction. *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assoc. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). The "Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause . . . so here the state statutory and federal constitutional inquiries merge." *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). So the two-part analysis collapses into one – if personal jurisdiction passes constitutional muster, it complies with Illinois law, too.

To satisfy the Due Process Clause, Defendants must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Millikin v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts exist where "the

defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1984).

Personal jurisdiction comes in two forms: general and specific. *Daimler AG v. Bauman,* 571 U.S. 117, 126–28 (2014). A court has general jurisdiction over a defendant only if he has continuous and systematic connections to the forum state. *Id.* at 127. General jurisdiction means that the defendant is so "at home" in the forum state that he can be sued there for anything, even a claim that has no nexus to the state at all. *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction is off the table in this case. Northwest 1 Trucking doesn't even attempt to argue that Defendants are at home in Illinois.

A court has specific jurisdiction "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010); *see also Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (cleaned up). That is, the claim at issue must arise out of the defendant's ties to the forum state.

A court has specific jurisdiction over a defendant when his contacts with the forum state "directly relate to the challenged conduct or transaction." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). "Specific personal jurisdiction is appropriate where (1) the defendant has . . . purposefully availed himself of the privilege of conducting business in [the forum] state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* The Court's

13

exercise of specific personal jurisdiction must also comply with "traditional notions of fair play and substantial justice" under the Due Process Clause. *Id.*; *see also Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). The key is that the "defendant's *suit-related* conduct must create a substantial connection with the forum State." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (emphasis in original). What's more, the relationship between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum." *Id.* (quoting *Walden*, 571 U.S. at 277) (cleaned up). A plaintiff must allege "injury *and* 'something more' directed at the state before jurisdiction over a foreign defendant may be considered proper." *Tamburo*, 601 F.3d at 706 (emphasis in original).

Defendants come forward with facts showing that they lack ties to this state. JCS Equipment does not have any offices, assets, or employees in Illinois.[3] *See* Decl. of Alejandro Haro, at ¶¶ 7–8 (Dckt. No. 22-2). JCS Equipment does not conduct business in Illinois, and does not "specifically market to customers residing in the State of Illinois." *Id.* at ¶¶ 9–10. Nobody from JCS Equipment set foot in Illinois for this bulldozer sale, either. *Id.* at ¶ 11. Defendants try to pin all of the sale interactions on the Plaintiff. Northwest 1 Trucking called JCS Equipment (in Texas) about the bulldozer, not the other way around. *Id.* at ¶¶ 12–13, 16.

The record provides a more-than-ample basis for exercising personal jurisdiction over Defendant Haro. For starters, Haro "doggedly" and "continuously" pursued the dozer sale on behalf of JCS Equipment to an Illinois buyer. *See* Am. Cplt. ¶¶ 15–17, 19, 21; *see also* Am. Decl. of Tony Maldonado, at ¶¶ 12, 14 (Dckt. No. 46). Haro called Maldonado's Chicago-based

---

[3] Again, JCS Equipment is merely an assumed name. It is a trade name used by Defendants Haro and Covarrubias, the real parties in interest. Still, Defendants presented their argument by referring to JCS Equipment, so the Court uses that terminology too.

14

phone number "at least 6 times." *See* Am. Cplt. ¶ 16; *see also* Am. Decl. of Tony Maldonado, at ¶ 6. He knew that the buyer's phone was ringing in Chicago.

Haro knew that Northwest 1 Trucking was an Illinois-based company and that it would use the crawler for its business in Illinois. *See* Am. Cplt. ¶ 18; *see also* Am. Decl. of Tony Maldonado, at ¶¶ 13–16. Haro specifically guaranteed that the dozer would perform for a specific excavation project on 30 acres of land in Chicago. *See* Am. Cplt. ¶¶ 21–22.

Haro made promises to an Illinois buyer about how a dozer would perform in Illinois. Haro's contacts with Illinois were not "random, fortuitous, or attenuated." *Walden v. Fiore*, 571 U.S. 277, 286 (2014). Based on Northwest 1 Trucking's allegations and declarations, Haro's repeated calls were meant to "lull[] [it] into a false sense of security" and induce the company into paying over $150,000 for a total lemon. *See Felland v. Clifton*, 682 F.3d 665, 675 (7th Cir. 2012). Such "lulling communications are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging fraud." *Id.* at 675–76.

Defendant Haro never set foot in Illinois, but he didn't need to. The Supreme Court has long recognized that modern business practices have evolved beyond in-person negotiations:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.

*Burger King Corp v. Rudzewicz*, 471 U.S. 462, 476 (1985). Personal jurisdiction "cannot be avoided simply because a defendant did not physically enter the forum state." *Felland*, 682 F.3d at 673.

What's more, Haro shipped the bulldozer to Illinois. *See* Am. Cplt. ¶¶ 20–22, 24; *see also Walden*, 571 U.S. at 285 ("[P]hysical entry into the State – either by the defendant in person or through an agent, *goods*, mail, or some other means – is certainly a relevant contact.") (emphasis added). That's 50 tons of connections to Illinois. He also sent wiring instructions for funds from Illinois. *See* Dckt. No. 58-1. The machine ultimately broke down in Illinois, too. *See* Am. Cplt. ¶ 30. Haro shipped machinery to Illinois that later broke in Illinois, so Northwest 1 Trucking's injury "arises out of" or "relates to" his contacts with the state. *See Tamburo*, 601 F.3d at 708.

Haro was in Texas when the parties formed the contract, but he knew that performance would largely occur in Illinois. Haro actively pursued a contract with an Illinois business for the use of a machine in Illinois. His communications with Northwest 1 Trucking "were not just incidental but [] central to the fraudulent course of conduct alleged in the complaint." *Felland*, 682 F.3d at 677. Haro knew that Northwest 1 Trucking operated in Illinois, and knew that the buyer "would suffer the brunt of the injury" – an inoperable hunk of junk – in Illinois. *See Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010). That is enough to establish personal jurisdiction over him.

Finally, exercising personal jurisdiction over Defendant Haro doesn't offend traditional notions of fair play and substantial justice. When a defendant "who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985). The Court considers the following factors listed in *Burger King*, including (1) "the burden on the defendant;" (2) "the forum State's interest in adjudicating the dispute;" (3) "the plaintiff's interest in obtaining convenient and effective

16

relief;" (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies;" and (5) the "shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 477 (quoting *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 292 (1980)).

Defendant Haro does not address this aspect of personal jurisdiction at all. *See* Defs.' Br. (Dckt. No. 22-1); Defs.' Reply (Dckt. No. 24). Regardless, the *Burger King* factors don't help his cause. As a nonresident, Haro does face the burden of out-of-state litigation. But Haro doesn't argue that his hardship is any greater than what courts "routinely tolerate" in the exercise of specific jurisdiction over foreign parties. *See Felland*, 682 F.3d at 677. And Northwest 1 Trucking would face a similar – if not more difficult – burden by litigating in Texas. *See id.* Illinois also has a "significant interest in providing a forum for its residents to seek relief when they suffer harm in Illinois from a wrong that occurred at least in part in Illinois." *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 432 (7th Cir. 2010).

Courts have found personal jurisdiction to exist in similar cases involving out-of-state sellers to in-state buyers. *See, e.g., Felland*, 682 F.3d at 670 (finding specific personal jurisdiction over an out-of-state vendor for claims of intentional misrepresentation connected to the sale of a condominium unit); *My Canary LLC v. Susieair, LLC*, 2017 WL 622235, at *2–*4 (N.D. Ill. 2017) (exercising specific jurisdiction over a foreign seller in the "botched sale of a Cessna Mustang aircraft"); *Trident Indus., LLC v. Machine Prods., Inc.*, 2014 WL 5441191, at *2–*4 (N.D. Ill. 2014) (finding specific personal jurisdiction over a Texas-based utility pole manufacturer that contracted with an Illinois business); *Elgin Dairy Foods, Inc. v. Savant Software, Inc.*, 2005 WL 2266598, at *3–*6 (N.D. Ill. 2005) (exercising specific personal

jurisdiction over foreign corporate officers of company that made false representations in a software sale).

So this Court has personal jurisdiction over Defendant Alejandro Haro. But the answer is different for Defendant Javier Covarrubias. According to the Amended Complaint, Defendant Covarrubias owns JCS Equipment, and Haro allegedly works for him. *See* Am. Cplt. ¶ 9. Haro allegedly was "working for" or acting "on behalf of" Covarrubias. *Id.* at ¶¶ 39, 56, 62, 69, Count VII ¶ 1,[4] Count VIII ¶ 1.

But the Amended Complaint doesn't allege that Covarrubias played any role in the sale, and Maldonado's declaration doesn't allege any such thing either. *See* Am. Decl. of Tony Maldonado (Dckt. No. 46). Northwest 1 Trucking never alleges that Covarrubias spoke with Maldonado about the sale. It doesn't allege that Covarrubias made any promises about the dozer, or arranged delivery, or facilitated the transfer of funds, or anything else. Northwest 1 Trucking merely alleges that Covarrubias is the owner and that Haro works for him.

It's not even clear that Covarrubias owned the assumed name "JCS Equipment" when the sale went down. The certificate for operation under an assumed name shows that Covarrubias's ownership ended in June 2018, two months before Haro and Northwest 1 Trucking even discussed the dozer. *See* Harris County Clerk Certificate (Dckt. No. 22-3). Even so, mere ownership, standing alone, is an insufficient basis to confer personal jurisdiction. *See Central States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000) ("[O]wners do not reasonably anticipate being hailed into a foreign forum to defend against liability for the errors of the corporation.").

---

[4] Starting in Count VII on page 15 of the Amended Complaint, the paragraph numbers start back at 1. By way of comparison, the last paragraph number of Count VI is paragraph 86.

As a result, this Court denies the motion to dismiss Defendant Haro, and grants the motion to dismiss Defendant Covarrubias for lack of personal jurisdiction.

## II.     The Forum Selection Clause

Defendants next argue that this case belongs in Texas state court because the parties agreed to a forum selection clause. They rely on language in the invoice saying that "ANY SUITS OR DISCLAIMERS ARE TO BE REVIEWED IN A COURT OF HOUSTON, HARRIS COUNTY, TEXAS." *See* JCS Invoice, at 2 of 2 (Dckt. No. 58-1) (all caps in original).

Courts typically enforce forum selection clauses (if the parties agree to them, that is). "[U]nder either federal or Illinois law, forum selection clauses are valid and enforceable." *Muzumdar v. Wellness Intern. Network, Ltd.*, 438 F.3d 759, 761 (7th Cir. 2006). A "valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring). Parties are well-positioned to decide the best place to resolve their disputes. The judiciary also benefits when a dispute is litigated in the right place. *See IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.*, 437 F.3d 606, 608 (7th Cir. 2006) (citation omitted) ("A court system has an independent interest in deciding which court in the system shall hear which cases, to minimize imbalances in workload.").

Both Northwest 1 Trucking and Haro agree that they entered into an oral contract for the sale of the crawler. The buyer paid the purchase price, and the seller delivered the 50-ton piece of machinery. *See* Am. Cplt. ¶¶ 23–26. There was offer, acceptance, and consideration. *See* UCC § 2-206(1); *see also* UCC § 2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement including conduct by both parties which recognizes the existence of such a contract."). And there was written confirmation in the form of JCS

19

Equipment's invoice. *See* UCC § 2-201(2); *see also W. Indus., Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir. 1984) (finding that a "formal written quotation," like an invoice, is "merely a written confirmation").

So there was a contract, and the only question is the scope of its terms. The inclusion or non-inclusion of the forum selection clause does not impact whether there was a contract in the first place. *See* UCC § 2-207; *see also Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir. 1991) ("If a term added by the offeree in his acceptance works a material alteration of the offer, the acceptance is still effective, but the term is not: that is, the contract is enforceable minus the term the offeree tried to add."); *Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1201 (7th Cir. 1991).

Northwest 1 Trucking insists that a forum selection clause was never part of the deal. Tony Maldonado says that he "never agreed to the jurisdiction being in Harris County, Texas." *See* Am. Decl. of Tony Maldonado, at ¶ 22. He points out that he discovered the invoice on September 4, 2018, several days after wiring the money. *Id.* And he never signed anything that required parties to file lawsuits in Texas: "I did not sign anything stating where jurisdiction would be . . . ." *Id.* at ¶ 23. As Northwest 1 Trucking sees it, Haro "unilaterally" changed the agreement by making "phantom changes," including the forum selection clause. *See* Pl.'s Resp., at 9 (Dckt. No. 23-1).

The parties don't address whether Illinois law or Texas law governs their agreement. But there is no choice-of-law problem because both states have adopted the Uniform Commercial Code ("UCC"). *See* 810 ILCS 5/Art. 1 *et seq.*; Tex. Bus. & Com. Code Ann. § 1.101 *et seq.*[5] No party argues that it makes a difference which state's law applies.

---

[5] For ease of reference, the Court will simply refer to the general UCC provisions and not the state codes.

Under the traditional "mirror image" rule, the terms of an acceptance must be the same as the terms of an offer. *See Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1174 (7th Cir. 1994); *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1335 (7th Cir. 1991). Otherwise, the terms of the acceptance are considered a counter-offer. *See Union Carbide*, 947 F.2d at 1335. But the UCC takes a different approach if the transaction involves the sale of goods between merchants. The UCC "allows an acceptance to make a contract even if it adds terms to the offer," and the "additional terms become part of the contract" if the contract is between merchants. *Id.*

The UCC governs here because the contract involved a sale of goods between two merchants. *See* UCC § 2-104(1) (defining a merchant as a "person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed . . . ."); *see also* UCC § 2-104(1), Comment 2 ("The term 'merchant' as defined here roots in the 'law merchant' concept of a professional in business. The professional status under the definition may be based upon specialized knowledge as to the goods, specialized knowledge as to business practices, or specialized knowledge as to both[.]"). Northwest 1 Trucking is "engaged in the business of metal recycling," and JCS Equipment "sell[s] various heavy-duty equipment." *See* Am. Cplt. ¶¶ 1, 11. Both parties rely on the UCC in their briefs, and no one argues that it does not apply. *See generally* Defs.' Joint Mem. in Support of Motion to Dismiss (Dckt. No. 22-1); Pl.'s Resp. (Dckt. No. 23).

Section 2-207 governs when the terms of an offer don't match the terms of an acceptance. Known as the "battle of the forms" provision, section 2-207 departs from the mirror-image rule by allowing the terms of an acceptance to differ from the terms of an offer. *See generally* UCC

§ 2-207; *see also Deere & Co. v. Ohio Gear*, 462 F.3d 701, 707 (7th Cir. 2006); *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1103 (7th Cir. 1997). A party can accept a contract and add terms, so long as the acceptance is timely and a party did not require identical terms:

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

UCC § 2-207(1); 810 ILCS 5/2-207(1). Section 2-207 applies "where an agreement has been reached orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed." *See* UCC § 2-207, Comment 1; *see also* 1 James J. White *et al.*, Uniform Commercial Code § 2:15 (6th ed. 2012).

The additional terms are "to be construed as proposals for addition to the contract." UCC § 2-207(2). They may be mere proposals, but the new terms have their foot in the door. The additional terms "become part of the contract" unless:

> (a)   the offer expressly limits acceptance to the terms of the offer;
>
> (b)   they materially alter it; or
>
> (c)   notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

*Id.*

The first and third conditions don't apply here. No one argues that acceptance was limited to the terms of the offer. And Northwest 1 Trucking did not object in a timely manner, either. *See generally* Am. Cplt.; Pl.'s Resp. (Dckt. No. 23-1); *see also* Defs.' Joint Mem. in Supp. of Their Mot. to Dismiss, at 3 (Dckt. No. 22-1). Maldonado admits that he discovered the

invoice on September 4, 2018. But instead of objecting, he accepted delivery of a 50-ton crawler that traveled 1,000 miles to get here.

That leaves the second condition, a material alteration of the terms of the deal. *See* UCC § 2-207(2). If the new terms "are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party." *See* UCC § 2-207, Comment 3. The Comments offer some guidance about what counts as a material alteration. Examples of provisions that materially alter a contract include:

> [1] [A] clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; [2] a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; [3] a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; [4] a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

*See* UCC § 2-207, Comment 4. On the flipside, examples of immaterial changes include: (1) a clause establishing a seller's exemption if there are supervening causes beyond his control; (2) a clause setting a reasonable time for complaints; (3) a clause setting interest on overdue bills if they are within the range of trade usage; and (4) a clause limiting the right of rejection for defects that are within customary trade tolerances. *Id.* at Comment 5; *see Milledgeville Cmty. Credit Union v. Corn*, 307 Ill. App. 3d 8, 240 Ill. Dec. 270, 716 N.E.2d 864, 868 (1999) (stating that Illinois courts may look to the Comments to determine the meaning of the UCC).

A material alteration would result in "surprise or hardship" to the other party. *See* UCC § 2-207, Comment 4. In Illinois, "the test for whether an additional term would be a material alteration in the contract is 'whether the addition constitutes an unreasonable surprise to one of the bargaining parties.'" *Schulze & Burch Biscuit Co. v. Tree Top Inc.*, 831 F.2d 709, 713 (7th

Cir. 1987) (quoting *Clifford-Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.*, 107 Ill. App. 3d 29, 62 Ill. Dec. 785, 437 N.E.2d 22, 25 (Ill. App. 1982)); *see also Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 315 Ill. App. 3d 248, 248 Ill. Dec. 43, 733 N.E.2d 718, 723 (2000); *Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1202–03 (7th Cir. 1991). But the focus is on surprise more than hardship. *See Union Carbide*, 947 F.2d at 1336 ("Hardship is a consequence, not a criterion. (Surprise can be either.)").

Additional terms become part of the contract only if the "offeror would be unlikely to object, because they fill out the contract in an expectable fashion, and hence do not alter it materially." *Union Carbide*, 947 F.2d at 1335–36. "An alteration is material if consent to it cannot be presumed. . . . What is expectable, hence unsurprising, is okay; what is unexpected, hence surprising, is not." *Id.* at 1336. An alteration is material "if the party against whom it is sought to be enforced would be ambushed by its addition to the contract." *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996).

The Seventh Circuit has warned against applying any per se rule to different types of contractual provisions. *Id.* at 1008. Whether a new term is an unreasonable surprise turns on the facts and circumstances of each case. *Id.* Materiality requires courts to consider the "parties' relationship, expectations, and course of dealing. As with so many other aspects of contract law, the question of materiality is marked by relativity." *Id.* The course of dealing between the parties is especially important, shedding bright lights on whether a provision is a material alteration. *Id.* at 1009; *Schulze and Burch Biscuit Co.*, 831 F.2d at 714–15.

The parties have not offered any case law from the Illinois Supreme Court (or any other Illinois court, for that matter) on whether a forum selection clause is a material alteration. It appears that Illinois state courts have not definitively decided that question one way or the other.

24

Even so, several courts within the Seventh Circuit have concluded that adding a forum selection clause materially alters a contract, absent a course of dealing. *See, e.g., Ridgelawn Cemetery Assoc., Inc. v. Granite Resources Corp.*, 2017 WL 3783401, at *5 (N.D. Ind. 2017) ("District courts within the Seventh Circuit have repeatedly held the addition of forum-selection clauses to be material alterations."); *The Sportsman Channel, Inc. v. The Small Group, Inc.*, 2008 WL 2909811, at *3 (E.D. Wisc. 2008); *Steel Dynamics, Inc. v. Big River Zone, Corp.*, 2006 WL 1660599, at *5 (N.D. Ind. 2006); *Prod. Components, Inc. v. Regency Door and Hardware, Inc.*, 568 F. Supp. 651, 654 (S.D. Ind. 1983). As one court explained, forum selection clauses can be an unwelcome surprise:

> [S]election of a distant forum with which a party has no contacts, while enforceable if contained in an agreement freely and consciously entered into, can result in surprise and hardship if permitted to become effective by way of confirmation forms that unfortunately are all too often never read. Subtle differences in courts, jurors and law among the states and considerations of litigation expense are factors the Court believes most merchants would consider important.

*Prod. Components,* 568 F. Supp. at 654. All too often, the differences aren't "subtle."

Courts within this Circuit are not outliers. There is widespread agreement in courts across the country that a forum selection clause is a material alteration of a contract within the meaning of section 2-207, absent a course of dealing between the parties. *See, e.g., Chrisman Mill Vineyards, Inc. v. Presque Isle Wine Cellars, Inc.*, 2018 WL 6380765, at *4 (E.D. Ky. 2018) ("[T]he forum selection clause was a materially different term."); *Wainess v. Smilemakers, Inc.*, 2018 WL 6809654, at *4 (E.D. Mich. 2018) ("[T]he forum selection clause . . . is a material alteration and therefore is not a part of the contract between the parties."); *Barrette Outdoor Living, Inc. v. Vi-Chem Corp.*, 2014 WL 3579297, at *4 (E.D. Tenn. 2014) ("[T]he forum selection clause in fine print on the back of defendant's invoice is not a part of the contract.");

*Duro Textiles, LLC v. Sunbelt Corp.*, 12 F. Supp. 3d 221, 224 (D. Mass. 2014) ("Sunbelt's forum selection clause is a material alteration to the contract within the meaning of § 2-207(2)(b)."); *Hardwire, LLC v. Zero Int'l, Inc.*, 2014 WL 5144610, at *8 n.8 (D. Del. 2014) ("[A] proposal to add a forum selection clause to the terms of an already existing agreement amounts to a proposal to materially alter that agreement."); *Tra Indus., Inc. v. Valspar Corp.*, 2010 WL 2854251, at *5 (E.D. Wash. 2010) ("[A] forum selection clause constitutes a material alteration to a contract."); *Tre Services, Inc. v. U.S. Bellows, Inc.*, 2012 WL 2872830, at *3 (W.D. Pa. 2012) ("Forum Selection Clauses are material terms to a contract and therefore require express assent to become binding."); *Construction Resource Group, Inc. v. General Technologies, Inc.*, 2013 WL 6284003, at *3 (D.S.C. 2013) ("[A] unilateral addition of a forum selection clause to a contract governed by the UCC is a material alteration of the contract that does not become a part of the contract."); *Insteel Wire Products Co. v. Dywidag Sys. Int'l USA, Inc.*, 2009 WL 2253198, at *2 (M.D.N.C. 2009) ("Since the Forum Selection Clause materially alters the agreement, it would not become part of the contract."); *Concrete Indus., Inc. v. Dobson Bros. Const. Co.*, 2007 WL 1455979, at *3 (D. Kan. 2007) ("The forum selection clause was an additional term and that additional term constituted a material change to the bid made by plaintiff."); *Trans-Tec Asia v. M/V Harmony Container*, 435 F. Supp. 2d 1015, 1025 (C.D. Cal. 2005) ("[C]ourts have generally found forum-selection clauses to be material alterations."); *One Step Up, Ltd. v. Kmart Corp.*, 1997 WL 391117, at *2 (S.D.N.Y. 1997) ("[W]e find that the purchase orders' forum selection clause was a proposal to add a material term to pre-existing oral contracts and as such required One Step Up's consent before it could be bound to litigate in Michigan.").

That's the approach in Texas, too. *See J.D. Fields, Inc. v. Independent Enterprises, Inc.*, 2012 WL 5818229, at *7 (S.D. Tex. 2012) ("Forum selection clauses are typically considered

material and therefore require express assent to become binding."). As a general matter, "Illinois in other UCC cases has tended to adopt majority rules," so courts "start with a presumption that Illinois . . . would adopt the majority view." *See Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1178 (7th Cir. 1994). There is no apparent reason to believe that Illinois courts would break from the pack and go their own way.

Most people want the ability to sue in their own backyard. Going to a local courthouse, with a local lawyer, for trial in front of local jurors is more appealing that a distant courthouse in a faraway state. It is more convenient, it's cheaper, and it's more predictable than unfamiliar territory. *See General Instrument Corp. v. Tie Mfg., Inc.*, 517 F. Supp. 1231, 1235 (S.D.N.Y. 1981) ("There are still subtle differences between the courts in various states. Certainly the jurors are selected from different economic, political and social backgrounds, which may affect their attitudes even in commercial matters. Counsel other than the party's regular attorney may be needed, at additional expense. The bench and bar has always regarded choice of forum as a significant right."). There is more at stake than mere convenience. Given choice-of-law considerations, the place of filing can impact which state's substantive law governs, too. A forum selection clause affects a cherished right – access to courts – that Americans hold dear.

Some courts find that a forum selection clause is not a material alteration – or any alteration at all – when there is an extensive course of dealing between the parties, including the repeated exchange of documents containing the disputed language. *See, e.g., Quality Wood Designs, Inc. v. Ex-Factory, Inc.*, 40 F. Supp. 3d 1137, 1149 (D.S.D. 2014) (noting that courts have found forum selection clauses to be part of a contract "when there is a course of dealing between merchants where forum-selection provisions have been repeatedly sent to a party") (citing cases). For example, in *TSR Silicon Res., Inc. v. Broadway Com Corp.*, 2007 WL

4457770, at *4 (S.D.N.Y. 2007), the court found that a forum selection clause was part of the agreement – even if it was a material alteration – given their course of dealing. The objecting party received at least 75 invoices with the forum selection clause during a five-year period. The language in the 76th invoice was hardly a surprise.

Another good example is *Midland Paper Co. v. Digital Pro, Inc.*, 2018 WL 3190819 (N.D. Ill. 2018). The parties did business together for several years. *Id.* at *3. The buyer ordered paper products 14 times, and the sellers sent documents with a forum selection clause 23 times. *Id.* The Court concluded that the buyer "cannot claim surprise" because he received documents with a forum selection clause "nearly two dozen times." *Id.* at *4.

This case is at the other end of the spectrum. *See Waukesha Foundry, Inc. v. Indus. Engineering, Inc.*, 91 F.3d 1002, 1008 (7th Cir. 1996) (requiring an inquiry into the unique facts of each case). Northwest 1 Trucking and JCS Equipment have no course of dealing. They had never done business together before, so there is no backstory to mitigate the surprise of losing the right to sue in the buyer's home state. *See Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1202 (7th Cir. 1991) ("Lack of prior dealing is an important factor to consider in determining the existence of unreasonable surprise."). The invoice at issue was the very first invoice between the parties, and it was surely an unwelcome surprise.

This Court concludes that the forum selection clause was a material alteration of the contract between the parties. The provision was not immaterial. If enforced, it would strip Northwest 1 Trucking of the right to sue in its own backyard. Northwest 1 Trucking never gave any indication, through a course of dealing, that it would be open to litigating only in Texas, half a continent away.

The last step in the analysis is whether Northwest 1 Trucking nonetheless accepted the additional term, even if it materially changed the terms of the deal. "Even if the alteration is material, the other party can, of course, decide to accept it." *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir. 1991). That is, "consent can be inferred from other things besides the unsurprising character of the new term: even from silence, in the face of a course of dealings that makes it reasonable for the other party to infer consent from a failure to object." *Id.*

The record at hand gives no indication that Northwest 1 Trucking accepted the forum selection clause. True, Maldonado didn't object to the forum selection clause per se. But it didn't take him long to object to the smoking, broken bulldozer. Haro knew right away that the parties were not on the same page.

Defendants could have argued that Northwest 1 Trucking accepted the forum selection clause by wiring some of the money *after* receiving the invoice. Haro emailed the invoice on August 31, and Maldonado wired the $150,000 purchase price later that day. *See* Email dated 8/31/2018 (Dckt. No. 58-1); Defs.' Resp. to Hon. Judge Steven C. Seeger's Nov. 20, 2019 Order, at ¶ 2 (Dckt. No. 43); Bank of America Statement, at 5 of 8 (Dckt. No. 43-2). Maldonado admits that he discovered the invoice no later than September 4. *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's April 15, 2020 Order, at ¶¶ 4–5 (Dckt. No. 59). But Maldonado then wired the delivery fees totaling $10,500 in the days that followed. He wired $5,000 on September 7, and wired another $5,500 on September 11. *See* Am. Decl. of Tony Maldonado, at ¶ 25 (Dckt. No. 46); *see also* Dckt. No. 23-4.

Maybe Defendants could have argued that sending some of the agreed-upon money after receiving the invoice constituted acceptance of the terms. But they made no such argument, and

thus it is waived. *See, e.g., Dachev v. Rich Am., Inc.*, 2019 WL 423192, at *5 (N.D. Ill. 2019); *Hill v. City of Harvey*, 2018 WL 278720, at *6 (N.D. Ill. 2018). In any event, it is unclear if any such argument would have advanced the ball. JCS Equipment received the delivery fees in the first instance, but it turned around and paid all of the fees to a third party. *See* Pl.'s Resp. to Hon. Judge Steven C. Seeger's Nov. 20, 2019 Order, at 2 (Dckt. No. 45) ("The other two payments on September 7, 2018 and September 11, 2018 were solely for the delivery of the dozer by a different entity and not for any part of the purchase price."); Dckt. No. 22-5, at 3 of 3.

## III.     Improper Venue

Defendants also devote one paragraph to arguing improper venue. But they don't really argue that the Northern District of Illinois is an *improper* venue. Instead, they argue that Houston is a "more proper" forum because the Defendants live there, and "a substantial part of the events occurred" there. *See* Defs.' Joint Mem. in Support of Mot. to Dismiss, at 7 (Dckt. No. 22-1).

The venue statute provides that a "civil action may be brought in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in this District. The buyer is located here, and the excavation project is located here too. The money left here, the dozer arrived here, and the dozer died here.

Venue is not a contest – the venue statute doesn't require the Northern District to be the *best* forum. *See Brito v. Urbina*, 2018 WL 3672743, at *4 (N.D. Ill. 2018); *Nicks v. Koch Meat Co.*, 260 F. Supp. 3d 942, 952–53 (N.D. Ill. 2017). The ties to the Northern District are more than enough to make it an acceptable forum.

**Conclusion**

Defendant Haro's motion to dismiss for lack of personal jurisdiction is denied.

Defendant Covarrubias's motion to dismiss for lack of personal jurisdiction is granted.

Defendants' motion to dismiss for *forum non conveniens* based on the forum selection clause is

denied. Defendants' motion to dismiss for improper venue is denied.


Date:  April 24, 2020 _____

Steven C. Seeger
United States District Judge

31